SEARS, ROEBUCK & CO. v. JOHNSON.

No. 1513.

Circuit Court of Appeals, Tenth Circuit.

July 2, 1937.

C. H. Hayes, of Oklahoma City, Okl. (Ames, Cochran, Monnet & Ames, of Oklahoma City, Okl., on the brief), for appellant.

W. J. Waite, of Oklahoma City, Okl., for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

This action commenced by the plaintiff, (appellee here) in the district court of Oklahoma county, in due time was removed by defendant (appellant) to the United States District Court for the Western District of Oklahoma.

W. R. Williams, an employee of the defendant, Scars, Roebuck & Co., was originally joined as a defendant but dismissal was entered as to him in the United States District Court on September 18, 1935.

The parties will be referred to in the order as same appeared in the trial court. In plaintiff's petition, it is alleged, among other things, that it was the special duty of defendants to see that the floors of the store were kept in a reasonably safe condition for all persons who came upon its premises to transact business with defendants, and that it was the further duty of the defendant, W. R. Williams, to see that the lights in or about the premises were kept in good condition, and lighted, so that one coming upon the premises might see the dangers, if any there might be, and that the defendants and each of them carelessly and negligently allowed and permitted the floors at the head of the stairway leading to the base-

ment to become wet and slippery, and permitted and allowed the lights over and above said stairway to become out of order, or entirely out, and that said slippery and unlighted condition was allowed and permitted from early in the morning of September the first until after this plaintiff was injured, a period of more than four hours, and that by reason of the carelessness and negligence on the part of these defendants in permitting and allowing said floor to become wet and slippery and said light to be out of order, or unlighted, caused a dangerous condition, which was either known to these defendants or should have been known to them had they exercised ordinary care for the safety of others, and which condition was hazardous to this plaintiff and to all others who might enter said establishment; that it was the duty of these defendants and each of them to see that the floor in and about the premises were in a safe condition and that lights in said place of business were lighted and sufficient so that a person coming in off the street might see any obstruction or danger, but that these defendants and each of them failed and refused to perform that duty; that on or about the 1st day of September, 1934, this plaintiff went to the store of the defendant to make a purchase, which article she intended to purchase was located in the basement of said store, and that as this plaintiff approached the stairway leading to the basement she stepped upon the wet and slippery floor, slipping and falling to the bottom of said stairway, a distance of approximately 15 feet, and that this plaintiff was unable to see and ascertain the wet and slippery condition of the floor at this place by reason of the lights being out over and above the said stairway, and because of insufficient light at this place, in falling, this plaintiff fell upon her left leg striking the iron part of the first or top step of said stairway, bouncing the remainder of the way into and upon the floor of said basement.

Defendant entered a general denial with a plea of contributory negligence on the part of the plaintiff.

Plaintiff in her behalf testified that on the morning of September 1, 1934, accompanied by her husband, she left their home around 9:30 or 10 o'clock in an automobile, going directly to the store of the defendant, whilst it was raining, alighting from said car and waiting at the entrance for her husband to return after parking, then both of them entered the vestibule of the east entrance, going to the basement by means of

the stairway immediately to the right of said entrance, and after 20 or 25 minutes, left by the said east entrance, visiting another store, and returning to said store about 11 o'clock, not then having a parking place, she proceeded, without her husband, down the same stairway, to the basement, made her purchase, and proceeded up the stairway to the said east entrance, and seeing her husband on the outside, started back to the basement to ascertain the whereabouts of a clerk who had offered to bring her parcel upstairs for her.

She further testified as follows:

"Q. Then what did you do? A. Started back down and as I started I slipped and fell.

"Q. At that time did you know what you slipped on? A. No, I didn't.

"Q. Did you see the wet on the floor? A. I never noticed it at that time.

"Q. When you fell where did you start to fall? A. From the top of the —

"Q. From the top of the stairs? A. Yes.

"Q. When you started back, do I understand, Mrs. Johnson, that you fell before you reached the stairway? A. When I started back down the stairway is when I fell.

"Q. Where had you got? Tell me as near as you can. A. Well, I just took two or three steps to the head of the stairs and my foot slipped and I went on down.

"Q. You hadn't then reached the stairway at the time you fell? A. Yes, sir, right at the head of the stairs.

"Q. Had taken hold of the rail which went down the side of the stairway? A. Yes, I had hold—my hand slipped off—no, I hadn't had hold of the railing.

"Q. Well, when was it then your hand slipped off? A. I just don't know.

"Q. You just don't know? A. Yes, I do, I will think a minute.

"Q. I am not trying to confuse you. Take all the time you want. A. I didn't have a hold of the railing. I never had hold of the railing.

"Q. How close to the stairs were you when your foot slipped? A. It seems like I had just reached the step and my foot slipped."

Plaintiff further testified she fell to the bottom of the stairs where some one picked her up, she being unable to rise, and then she was carried to the mezzanine floor, where she was when her husband arrived from the outside of the store where he had been with his car, he having been called in to where she was by some one, and that while she was there on the mezzanine floor, the manager of the store said to her husband, after his arrival, in her presence, that they mopped the floor frequently.

That as she was assisted out of the defendant's store, she observed that there were no mats on the floor at the doorway going into the store; that it was about an hour and a half or two hours after her fall before she left the store, and that she thought it was along about 11 o'clock or maybe after 11, close to the noon hour, but before noon, when she fell down the stairway.

Bob Bieghtol testified that he was in the transfer business, and was in defendant's store a little before noon, when it was raining steadily, that he had gone in the basement to get a tail-light for his truck which probably burned out, having refused to work, and when he went down into the basement, he noticed that it was slick. He said, "I kind of slipped myself," and that it was a "little bit dark in there," and that he observed the floor of the store was "wet."

He testified in detail as follows:

"Q. You say you slipped yourself? A. Yes.

"Q. And whereabouts was that? A. Right at the top stair.

"Q. That was at the head of the stairway? A. Yes, sir.

"Q. After you had gone into Sears, Roebuck & Company's Store, did you see any one down in the basement there that you knew? A. I saw Mr. Johnson in the little vestibule and we stood and talked quite a while. It was raining straight down and I looked at my watch as I was figuring on going home to dinner, and I said if it didn't quit I would have to go anyway, and it was 11:30, but it didn't quit.

"Q. At the time you slipped, was that before or after you saw Mr. Johnson? A. Before.

"Q. How long before? A. Not over a minute or two. I had just come up and met Mr. Johnson."

On cross-examination the witness testified that he did not see Mrs. Johnson (the plaintiff) while in the store; that he did not know until several days later that anything out of the ordinary had happened on the

1st of September, and further in detail as follows:

"Q. When you say it was dark and gloomy in there, do you base that statement on the fact that it was raining and when it is raining it is rather cloudy? A. Yes.

"Q. You don't, as you have indicated, have any direct independent recollection based on anything you observed at that particular time? A. No. It is generally that way.

"Q. And that is the reason you say it was then? A. Yes.

"Q. The time you slipped, when did that happen? A. Just probably five minutes. I went down—

"Q. Was it when you went down in the basement? A. Yes, sir.

"Q. You kind of slipped at the head of the stairway, is that right? A. Started to, I didn't fall, no sir.

"Q. I know that, just tell me what you did then? A. Started to step down and slipped on the first step.

"Q. You slipped on the first step? A. Yes, sir.

"Q. You didn't slip at the top of the stairs? A. No, sir.

"Q. That was after you had gotten on the stairway? A. Yes, sir. Had hold of the bannister.

"Q. You had yourself come in from the outside? A. Yes, sir.

"Q. It was raining, as you say, very hard at the time? A. Yes."

Tom Coe testified that he was in the store of Sears, Roebuck & Co.'s (defendant) store on September 1, 1934, somewhere between 11 and 12 in the morning; that his attention was called to the fact that some one had fallen on the stairway by a gathering crowd, and that he did not know who the party was at the time. When asked if after he learned that the party had fallen he noticed the floor, he replied as follows:

"A. Well, not in particular.

"Q. Can you tell the court the condition of the floors? A. I never paid enough attention to it to try it."

At the conclusion of all the plaintiff's testimony, the defendant interposed a demurrer thereto, the court reserving its ruling thereon. Thereupon defendant introduced the following evidence:

H. B. Randall testified that he was building engineer for Sears, Roebuck & Co. (defendant) and had been for seven years; that as such he had charge of the building, cleaning, heating, and everything in general in the building; that he had supervision of the porters, and that on September 1, 1934, the porters were Bailey and Williams; that the duties of the porters were as follows:

In the morning they had a regular routine of cleaning, and after they got through that, they inspected the building, picked up matches or anything that might cause an accident or a hazard of any kind; that on the day that Mrs. Johnson fell it had rained, and that the witness had just returned from lunch when he was told there had been an accident on the stairway; that he inspected the head of the stairway going to the basement, which was dry, a porter just having finished mopping a short time before; that there were no marks, dirt, slush, or water.

On cross-examination the witness testified that his lunch hour was from 1 to 2 p. m. and that as he returned to the store they were carrying the lady to the mezzanine floor; that a porter was kept near the entrances nearly all the time on a rainy day to keep the water and mud out, in order to keep the floor from getting slick.

In answer to a question by the court, the witness testified as follows:

"Q. (By the Court) Where did you mop the floor? A. We have a north and east entrance, and they drag water in there on rainy days, into these vestibules, and we have a porter down there nearly all the time on a rainy day, right down there close to keep this water and mud out.

"Q. You mean around the entrance? A. Yes."

E. B. Bailey testified that he had worked for Sears, Roebuck & Co. (defendant) since December, 1929, and on September 1, 1934, did general porter work all over the building; that his duties were to mop the stairway, see that everything is kept clean, pick up papers and match stems off the stairway to prevent accidents; that between 1 and 3 o'clock on September 1, he having returned from lunch at 1 o'clock, inspected the stairs and mopped them over and mopped inside the door to the east entrance; that he became aware of the accident when he saw several people gathered on the stairway to the basement; that at that time he inspected the stairway and the floor in the vicinity of the east entrance, and with reference to the condition of the floor, stated:

"A. Dry; been perfectly dry, but it had been mopped. It had been raining, and it was damp, but it was dry; not enough to cause anyone to slip."

On cross-examination the witness testified:

"Q. And when it rains, the person walking on the sidewalk, when they step inside the door, they are right inside in front of the stairway? A. Yes, sir.

"Q. (By the Court) Is there one door or two doors there? A. Two doors.

"Q. You come from the street through one door? A. Yes, sir.

"Q. Is there a vestibule there then before the door to the main entrance? A. Yes, sir.

"Q. And there are two doors between the outside and inside doors? A. Yes, sir."

The witness, on further examination by the court:

"Q. (By the Court) Did you mop the floor after you came back from lunch? A. Yes, sir.

"Q. What time? A. After 1:00 o'clock.

"Q. How do you know the accident occurred after that time? A. Well, I went into the basement where I had mopped the stairway after I came from lunch. That is my duty on rainy days. I went in the basement fixing to go up the second floor and I saw a crowd over by the stairway and I went over there and saw some one said somebody had fallen and I went to inspect.

"Q. Did you see this lady there? A. No, sir. I met the other porter and he said he had carried her a fan up to the mezzanine floor for her."

Bill Williams, testified that he was working for Sears, Roebuck & Co. on the 1st of September, 1934, and worked for that company until about two months prior to the trial; that on the day in question he was going down the stairway to the basement and was told by Mr. Lann to get a fan; and this occurred after 1 o'clock, and that at that time he examined the stairway and the floor at the head of the stairs; that his examination revealed that it was not dirty enough to need mopping so he did not mop it.

On cross-examination the witness testified that he had mopped the floor after 12:15; that the other porter came from lunch at 1 o'clock and he supposed he mopped it when he came in.

Jerome Lann testified that he was employed by Sears, Roebuck & Co. on the 1st day of September, 1934, and worked in the basement at the foot of the stairway; that he recognized Mrs. Johnson, and in answer to a question of what he saw at the time she fell, stated:

"A. I was standing there talking to a gentleman, and this lady was about—I was looking right at the stairway— she was almost half-way up, I would say two-thirds maybe, and we were both looking the same way, and I saw her, it looked like to me she swooned and she fell. * * *

"Mr. Waite: We object to that and ask that it be stricken.

"A. Just the way I saw it.

"The Court: You are stating how it looked. Go ahead and state what you saw.

"Q. How many steps if you can estimate from the top was she down at the time you saw her starting to fall? A. I would estimate she was not less than seven or eight steps from the top of the landing when that fall started."

That he carried Mrs. Johnson to the mezzanine floor, procured a fan from Williams, the porter, and on returning to the basement inspected the floor; found it was dry; went to the basement and then went back to the mezzanine floor. The witness further testified:

"Q. On any of those trips did you observe any mud or foreign matter or substance on the floor near the entrance way or on the stairway. A. I very carefully looked for it as I came back down. Nobody had touched those steps. I imagine I was gone possibly from the time I carried Mrs. Johnson to the mezzanine floor I hadn't been gone to exceed three to five minutes.

"Q. Did you see anything such as I described? A. I looked for it and there was nothing on there.

"Q. (By the Court) What time did this occur? A. I go to lunch at 12:00 o'clock, and I was back from lunch.

"Q. What time did you return? A. I returned at one o'clock, and I was back in the Department, and I would say something in the neighborhood of 1:30. I just don't know the exact moment, but it was after one o'clock.

"Q. After you came back? A. Yes, sir."

On cross-examination the witness testified that he did not recall the party to whom

he was talking at the time of the fall, but that they were conversing about some machinery; that there were twenty-one steps in the stairway, each eleven inches wide and seven inches high; that at the time of the accident he was standing behind the counter at the bottom of the stairs; that when he saw the plaintiff falling, he ran from behind the counter over to the stairway and caught her before she reached the bottom; that he took particular notice of the floor at the head of the stairway, although he knew Mrs. Johnson did not start to fall until she was part way down the stairs, because he wanted to keep from having that floor to become that way.

Fred Poulter testified that he was engaged in the oil royalty and production business and was in the store of Sears, Roebuck & Company on September 1, 1934, when a lady fell on the stairway; that he was in the basement right in front of the stairway and was facing the stairway as he was fixing to leave; that the witness who preceded him on the stand had waited on him and that he observed the following:

"A. I was standing facing the stairs. There is a counter right across in front of the stairway, and I was talking to this clerk, and had my papers, my bundle in my hand fixing to go, and he was trying to sell me a little motor, and a lady came down the stairs. She was probably not quite half way down the stairway, and she reached over on the railing and eased down like that and fell over on the steps.

"Q. What did this Mr. Lann do at that time, that you observed? A. He picked her up. I said, 'There is a lady fainting.' He did himself."

On cross-examination the witness testified as follows:

"Q. (By Mr. Waite) Now what is your business? A. Oil royalties and production."

F. E. Payne testified that he was a customer in the store of Sears, Roebuck & Co. on September 1, 1934, when Mrs. Johnson, whom he recognized, fell; that he was at the bottom of the stairs in the basement about 1 o'clock having completed the purchase of some electric supplies, and was talking to the electric manager; that he saw the plaintiff come to the head of the stairs, hesitate, start down; glanced away and when he looked back the plaintiff was falling down the stairs.

On cross-examination the witness testified that he was leaning on the rail which ran alongside the west side of the stairway with his arm on the bannister and was looking toward the stairway.

Robert E. Darrough testified that on September 1, 1934, he was employed in the electric department of Sears, Roebuck & Co.; that he was on duty when Mrs. Johnson fell; that it was after 1 o'clock when he returned from lunch; that he had waited upon the witness Payne, and that Mr. Payne assisted in catching Mrs. Johnson as she fell; that the witness did not see the fall.

On cross-examination the witness testified that he was standing to the right of Mr. Payne or west of the stairway, and that he did not see Mrs. Johnson on the stairway.

In rebuttal on the part of the plaintiff, Mrs. L. F. Morris testified that she was notified that Mrs. Johnson had fallen one day just before she had her lunch between 12 and 12:30, and thereupon the parties rested, and the defendant moved the court for the directed verdict in its favor, which the court overruled, and exceptions saved.

It is not essential to outline the evidence as to the plaintiff's injuries, the question here being as to whether the evidence introduced was sufficient to justify the overruling of a motion on the part of the defendant for a directed verdict in its favor.

As a business invitee, the defendant, as owner of the premises, owed a duty to plaintiff to exercise reasonable care to keep the premises in a reasonably safe and suitable condition so when she entered the store, upon such invitation, she would not be unnecessarily or unreasonably exposed to danger. Bennett v. Louisville & N. R. Co., 102 U.S. 577, 26 L.Ed. 235; 45 C.J. 826–828, and cases cited under note 73.

The defendant was not an insurer of the safety of such invitee. F. W. Woolworth Co. v. Williams, 59 App.D.C. 347, 41 F.(2d) 970; Bader v. Great Atlantic & Pacific Tea Co., 112 N.J.Law, 241, 169 A. 687; S. S. Kresge Co. v. Fader, 116 Ohio St. 718, 158 N.E. 174, 175, 58 A.L.R. 132.

No unusual or extra degree of care was chargeable to the defendant with respect to the safety of its customers, other than the duty of exercising reasonable care to keep its store in a reasonably safe condition. F. W. Woolworth Co. v. Williams, supra; Kaufman Department Stores, Inc., v. Cranston (C.C.A.3) 258 F. 917, 918; Chickasha Milling Co. v. Plowman, 94 Okl. 170, 221 P. 476.

■ The burden was upon the plaintiff to establish negligence upon the part of the defendant. The only testimony introduced by the plaintiff relative to any negligence was that of herself and Bieghtol. Plaintiff's was that she slipped at the head of the stairs, not noticing at the time whether the floor was wet. Bieghtol's testimony was that he slipped a little at the top of the stairs on his way down, stating that it was slick, because he slipped himself. He also observed that the floor was wet.

With respect to the allegation that the stairway was unlighted, Bieghtol testified that it was a little dark. He based that statement on account of the fact that it was raining as under such circumstances it was usually gloomy. No other testimony supported such allegation.

From the record, it appears that when it is raining in said city, some water is usually carried into stores by parties going in and out, and that those coming in from without on a wet day have wet shoes.

It is just as reasonable to infer that plaintiff slipped because of wet shoes as on account of a damp floor.

Under either theory, the evidence is insufficient to make an issue as to negligence on the part of defendant. The conditions complained of were not shown to have existed for any length of time. Whilst there is evidence that it was raining around 9:30 and 10 o'clock in the morning, its extent is not stated although plaintiff should have been able to state the extent.

As to what period during the rain it was sufficient to wet the streets so that the shoes of persons entering the store would carry in water or mud, if at all, is not disclosed. The rain in the beginning may have been merely a drizzle and have gradually increased. So you cannot point out with any reasonable certainty as to when or how long, if at all, that floor was sufficiently wet as to place the defendant on notice that it should receive attention by mopping or otherwise.

There was no evidence on part of plaintiff that her shoes were not wet, and that information was peculiarly within her knowledge.

Evidence on part of plaintiff was that defendant's manager, whose name is not given, but who apparently was not present at the trial, stated to the plaintiff and her husband that they "mopped the floor frequently."

That may have meant that they had done that frequently to keep the floor in a reasonable condition as to safety, or that they had mopped it frequently that day. No question was raised as to the competency of this evidence.

That evidence introduced on the part of plaintiff, and not controverted, under either theory would tend to show reasonable care on part of defendant and harmonizes with evidence introduced at the trial on the part of defendant.

Its building engineer for several years had charge of the building, cleaning, heat, and everything in general relating thereto, and supervision of the porters who had a regular routine of cleaning each morning, after which they picked up matches or anything that might cause an accident or hazard of any kind, and mopped the floors when it rained. The two porters who were on duty that day testified as to the discharge of these duties and the mopping of the floors. One of the porters testified he had ceased to be in the employ of the defendant for two months prior to the trial. The employees in the business as salesmen or otherwise then working in the basement or on the floor and customers present testified.

The burden rests with the plaintiff to show that the defendant did not perform the duty incumbent upon it to exercise reasonable care to protect the plaintiff as an invitee from injury whilst on its premises.

■■ The fact that invitee may have slipped on the floor of the store did not shift to defendant burden of establishing that accident did not occur through its negligence, nor create presumption of negligence. The presumption is that defendant exercised reasonable care, as respects liability for injury to plaintiff on account of slipping on floor. Defendant was not an insurer against accidents to persons entering the store for making purchases or otherwise on invitation.

■ Unless plaintiff introduced sufficient evidence to make an issue that plaintiff slipped on floor through negligence of defendant's employees, or because of condition of which defendant had actual or constructive notice, in time to remove the cause by mopping or by other means which was its duty to reasonably do, recovery cannot be here affirmed.

In Kresge Company v. Fader, supra, the accident complained of occurred in a very similar way. It was raining and incoming customers had carried in water on their shoes and some rain had blown in the door as it was opened by in-coming and out-going

shoppers. The wet spot complained of was just inside the door. The plaintiff there fell on the wet spot and charged that Kresge was negligent in not having a rubber mat on this particular part of the floor and in permitting the moisture to be on the floor.

The court said: "Everybody knows that the hallways between the outside doors of such buildings and the elevators or business counters inside the building during a continued rainstorm are tracked all over by the wet feet of people coming from the wet sidewalks, and are thereby rendered more slippery than they otherwise would be. The same thing is true in the hallways of all post offices. It is not the duty of persons in control of such buildings to keep a large force of moppers to mop up the rain as fast as it falls or blows in, or is carried in by wet feet or clothing or umbrellas, for several very good reasons, all so obvious that it is wholly unnecessary to mention them here in detail."

In Miller v. Gimbel Bros., 262 N.Y. 107, 186 N.E. 410, the court said: "The owner of a store must take reasonable care that his customers shall not be exposed to danger of injury through conditions in the store or at the entrance which he invites the public to use. He cannot prevent some water and mud being brought into an entranceway on a rainy day and he is not responsible for injuries caused thereby unless it is shown that the construction of the store is inherently dangerous or that he failed to use care to remedy conditions which had become dangerous, after actual or constructive notice of such conditions." See, also, F. W. Woolworth Co. v. Williams, supra; Bader v. Great Atlantic & Pacific Tea Co., supra; Bell v. Great Atlantic & Pacific Tea Co., 288 Pa. 160, 135 A. 607.

■■ Defendant was put upon notice that the entrance to its store would become wet from rain dripping from umbrellas, or as usually may be brought in on account of a rain going on outside, and that a dangerous condition might result if such floor were not mopped from time to time. However, there is no evidence that any dangerous condition was permitted to come into being, and there is little evidence that the floor was even wet and no evidence that a dangerous condition existed because of no lighting.

If what was shown in this case was sufficient to permit recovery, it would require store owners to have a mopper stationed at the doors on rainy days for the sole purpose of mopping up after every customer entering or leaving the premises. Every store owner would be required to be an insurer against such accidents to public invitees who came in on rainy days with wet shoes.

There were no defects in the floor or the stairway. No claim is made that it was other than level, or that it was improperly constructed in any manner. There was no soap or soapy water or grease on the floor, nothing of any kind thereon except it was rendered wet by water, which got there in the manner herein disclosed.

The plaintiff was familiar with the condition existing in the store on its floors and on the stairway and in the basement having theretofore on the same morning, entered upon the floor through the vestibule at the east entrance and gone down the stairway to the basement and after about 20 or 30 minutes had returned by the same stairway to the floor and out through the east entrance, and within about an hour having gone with her husband to another store, re-entered defendant's store upon the floor through the same entrance, and then down the same stairway to the same basement, and then back by the same stairway to the floor, and observing her husband waiting for her on the front, returned to the top of the stairway, when the accident occurred, prior to and during which time she never noticed the floor being wet, nor did the witness, Tom Coe, notice the floor being wet.

The witness Bieghtol made no mention of the floor or the steps being slippery or that his shoes were not wet, merely stating that as to the top of the steps of the stairway: "I kind of slipped myself," and "a little bit dark in there," and that the floor was wet, not stating the extent. He further said it was a little bit dark on account of the rain when usually it was gloomy.

The trial court should have sustained defendant's motion for a directed verdict in its favor. Its judgment is reversed with instructions to grant the appellant a new trial.

BRATTON, Circuit Judge (dissenting).

A merchant is not an insurer of the safety of customers in his store, but he is required to exercise ordinary care to provide a reasonably safe place for them. A customer cannot recover damages for injuries suffered by slipping on a leaf of spinach, a pea pod, a broken bottle of hand lotion, an oily place on the floor, a wet place on the floor, or other comparable element of fact, without

showing that the owner knew of the condition, or that it had existed for a sufficient length of time that in the exercise of ordinary care it was discoverable and remediable. F. W. Woolworth Co. v. Williams, 59 App.D.C. 347, 41 F.(2d) 970; Sears, Roebuck & Co. v. Peterson (C.C.A.) 76 F.(2d) 243; Graham v. F. W. Woolworth Co. (Tex. Civ.App.) 277 S.W. 223; Great Atlantic & Pacific Tea Co. v. Logan (Tex.Civ.App.) 33 S.W.(2d) 470; Varner v. Kroger Grocery & Baking Co. (Mo.App.) 75 S.W.(2d) 585; Bell v. Great Atlantic & Pacific Tea Co., 288 Pa. 160, 135 A. 607; Bader v. Great Atlantic & Pacific Tea Co., 112 N.J.Law; 241, 169 A. 687; Coyne v. Mutual Grocery Co., 116 N.J.Law, 36, 181 A. 314; S. S. Kresge Co. v. Fader, 116 Ohio St. 718, 158 N.E. 174, 58 A.L.R. 132; Miller v. Gimbel Bros., Inc., 262 N.Y. 107, 186 N.E. 410.

Defendant knew that on rainy days customers brought water into the store at the entrance. It kept a porter there nearly all of the time on such days to mop up the water. It had been raining throughout most of the morning preceding the accident in question. Due to that fact, it was dark inside the door and adjacent to the stairs. Water had accumulated there and the floor was slippery. Defendant was charged with knowledge of such conditions and they had existed for a sufficient length of time that the exercise of reasonable care required correction. The duty to remedy a condition of that kind is an active and continuing one to be fulfilled through the exercise of reasonable care. Sears, Roebuck & Co. v. Peterson, supra. For these reasons, this case is distinguishable from those in which plaintiff merely showed the existence of a dangerous condition, but failed to prove either that defendant had actual knowledge of its existence or that it had existed long enough reasonably to require discovery and corrective measures.

It is said by the majority that there was no evidence on the part of plaintiff that her shoes were not wet; that information respecting such matter was peculiarly within her knowledge; and that it is just as reasonable to infer that she slipped because of wet shoes as on account of a damp floor. A witness engaged in the transfer business testified that he was in the store that morning; that it was raining; that he observed the floor just inside the entrance; that it was wet and that he slipped on it right at the top of the stairway; that it was a little bit dark in there; that he went to the basement to make a purchase; that he talked with the husband of plaintiff in the vestibule; that he intended to go home for lunch; and that on looking at his watch and seeing that it was 11:30 o'clock he stated he could not go unless it quit raining. Plaintiff testified that she and her husband were in the store about 9:30 or 10 o'clock; that they entered and departed through the east door; that they returned near the noon hour, but before noon; that there being no parking place, she went to the basement alone, made a purchase and went upstairs; that she saw her husband outside and started back to the basement to ascertain the whereabouts of the clerk who had expressed a willingness to bring her package upstairs; and that when she had taken two or three steps and just as she reached the top of the stairs, she slipped and fell to the bottom of the stairs. That testimony and the inferences which may reasonably be drawn from it, constitute substantial support for the conclusion that it was slightly dark just inside the entrance and near the top of the stairway; that the floor was wet at that place; that plaintiff was either standing in the wet place or in turning and starting back to the basement, she walked through it; and that as a result she slipped, fell, and was injured.

In passing upon the motion for directed verdict, it was the duty of the court to view the evidence in the light most favorable to plaintiff. Since there was substantial evidence tending to establish actionable negligence, all countervailing evidence should have been disregarded. A. B. Small Co. v. Lamborn & Co., 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597; Chambers v. Skelly Oil Co. (C.C.A.) 87 F.(2d) 853. The court was right in denying the motion and in submitting the case to the jury. The jury resolved the issues in favor of plaintiff, and the judgment should be affirmed.